for argument. Mr. Hoppe. Good afternoon. How are you? May I please the court? My name is Matthew Hoppe. I represent the petitioners in this combined appeal. There are two appeals, one addressing the original BIA decision and one addressing the board's denial of the motion to reconsider. I'd like to start with the issue of future persecution because I think it's probably the most fundamental error in the board's initial decision. When the immigration judge heard this case, he said he wasn't going to decide whether there would be future persecution in the home country because he had already decided that the harm would not be on account of a particular social group and thus the issue of future persecution wasn't necessary. We think that was a major error because the determination of whether the harm will be on account of or motivated by some other factor first requires us to determine as a matter of fact what's going to happen. What is the future harm? Who's the persecutor? And without a factual determination about who will be at issue of harming this family and what is it that they're going to do, you've placed the cart before the horse. The petitioners raised this argument at the board and the board in bed adopted and affirmed the immigration judge's decision. This argument is based on the statute which defines refugee to mean a person who is subject to future persecution on account of one of five statutory bases. And the court in Krachmarov said that the future persecution determination is the critical inquiry in any asylum case because first I think it's logical. First you have to know what's going to happen before you can figure out why it's going to happen. The board has said that the determination of what's going to happen in the future is predictive fact finding which is a finding of fact which the immigration judge has to do. Here the immigration judge didn't do any of that fact finding about future persecution. And so all of the other issues that are at stake before the court are really subsidiary to this one. Before we can know if the group has a nexus to the harm, if the group is immutable, one needs to know what's going to happen in the future. Help me with why finding a group is an essential regardless of what you're talking about. Okay. Well, there are three aspects of that that the agency decided. The immigration judge said the groups aren't immutable. There are separate reasons why I think the agency was wrong about that. But to answer your question directly, we don't really even know which group is at stake until we know what future harm is going to happen. Here there were two kinds of future harm that was proposed at court. One was these threats and attacks by the gangs. And one was what was phrased as economic persecution, being forced to shut down her business. The immigration judge never addressed the economic persecution argument. It was raised at the board and the board never addressed it. And so the motivation for why those things would happen, whether it's the shutting down of the business or the threats and attacks, are probably different. They may be motivated by different things. It's hard to know. But our initial argument is really that you can't answer that question even at a most basic level without knowing what's going to happen. What is the future persecution? And for the immigration judge, they have to determine as a matter of fact, is that going to happen? Who's the persecutor? Before knowing whether they'd be motivated by one of those groups, isn't the economic persecution kind of off the table, though, in some respects, because she testified that she's not going to reopen a business. And if she were returned to Mexico, that's true. Although as a matter of past persecution, she could still win asylum if the agency had addressed whether that past harm amounted to persecution that would have given rise to a rebuttable presumption of future persecution. And then there would have to be some back and forth about whether the government had rebutted the presumption. There's also humanitarian asylum. If you're subject to past persecution, you can still win asylum even if you're not at risk of future harm. So in this case, even if she's not at risk of having her business closed, for example, she could still win humanitarian asylum if she could prove that that past harm was persecution. And I think this is a poorly developed record largely because neither the immigration judge nor the business closing and the effects on her business were persecution. On the social group, when the immigration judge said that these social groups were immutable, we also think the judge applied the wrong legal standard. And the standard has been well set by this court starting in the Gaitan case that's cited in our briefing. A particular social group has to be immutable to meet the standard. And immutable has been defined to mean that the traits that unify the people are traits that they can't change or that they shouldn't have to change. The immigration judge's decision is brief on this. He really just addresses whether Ana could change the fact that she's a woman in her country without protection by saying that, well, her husband would go back with her, and if not, she could move in with a relative. The problem is you're missing the second part of that standard, which is, is that something we should require of people? Is that a trait that she should have to change? Let's say she's got an abusive husband. Would we say you have to move in with your spouse or you have to move in with a family relative for this trait to be immutable? And neither the immigration judge nor the board addressed that. But I would say at a fundamental level, when the particular social group is women without male protection, the solution isn't to say, well, you should find a man and live with him. And at a basic level, I think the agency has to address and hasn't yet addressed whether that is the second half of the immutability standard, whether that's something we, a trait that they shouldn't have to change. Is there any evidence that any of the relatives are abusive? I mean, was that kind of evidence presented at the, before the immigration judge? No, I was offering a hypothetical. But, you know, there is one instance the immigration judge said, well, her husband is going to go back with her. So that group, the women without male protection, isn't immutable. But there is testimony that he had already left her once for the United States. And her argument at the board in her briefing at the board was, yes, she testified, I think, pretty clearly that her husband would go back with her. But that's just her testimony. There's no real guarantee he's going to go back with her. Or if he does, that he would stay because he's left before. So are you arguing she's not, are you arguing she's not credible? No, no, we're not arguing she's not credible. You're saying she can't speak for another person that he would definitely stay with her or, or, or what? But again, I think the more fundamental and where I think the board errors is on the second half of that standard. Yes, it is possible her husband would move back with her. But also, is that something we should require as a legal matter for somebody to qualify for as a particular social group? And under the Chenery Doctrine, the board hasn't yet addressed that. This court doesn't have to opine or wade into whether that's a good policy matter or good asylum policy. It's really for the board to address. And to date, the board hasn't addressed it. So reasonable, though, I mean, I mean, just think about it. It's one thing. The relative is one thing. Let's lay that aside. But when she testifies, my husband's going to go back with me. And the proposed social group is women without protection. Isn't it reasonable to assume that she will no longer be a reason a woman without protection based on her own testimony? Yeah, I think we have to bifurcate it into past persecution or future persecution. The nexus for past persecution, she said they targeted me because I was single. That's already happened in the past. That that can't change. And if the judge said in both instances, it's not to do with that as to past persecution because her husband was gone. He hadn't gone come back. I think you're correct on the future persecution that she said her husband was going to come back. I think there's at least a possibility that he would. And there's some logic to that, that, well, you're not a woman without male protection any longer. But what's missing here is if the group applied for past persecution, then there's a bunch more work for the court to do. If the court were to say, you have past persecution and an immutable social group and nexus, she can still win asylum on that basis without getting into, there would be a lot more work to do on the front end. If the burden had been met for past persecution, then the burden shifts to the department to say whether the presumption has been rebutted and the agent has to address humanitarian asylum. Our argument is that all of this work is undone because the judge, I think, sort of skipped over a lot of the meat of what was happening here, both on the issue of future persecution and on not addressing that second half of the immutability standard. So we would ask the court to remand under Chenery primarily so that the board can at least address these things in the first instance. The last thing I want to talk about is social distinction or social visibility because it only comes up in the BIA's first decision. The board says, the board adopts and affirms the immigration judge's decision, but then in justifying why it's saying these aren't social groups, it says that they're not socially visible and that there's no nexus. The immigration judge hadn't made any factual findings about whether the group was socially visible. So if that is part of the decision that agency is now challenged before the court, the problem is the lack of fact-finding. The board can't do fact-finding on visibility. The immigration judge didn't do any fact-finding on visibility. And it's been renamed to be social distinction. But we filed a motion to reconsider with the board raising these issues and the board, I don't think, has adequately addressed them. In its briefing, the Department of Justice has said the court doesn't need to address this because the issue of immutability is dispositive. But we would argue that I think we're right on the law in terms of immutability, at least with respect to past persecution. And so the other issue of social distinction, which is the only other issue the board listed in its first decision as to why the groups don't qualify, we think the board's wrong there too. So if there aren't any other questions, I think I'll reserve the rest of my time for rebuttal. You may. Thank you. Ms. Smith. Thank you, Your Honor, and may it please the court. Holly Smith on behalf of the Attorney General. The dispositive determinations by the agency in the asylum case were that the petitioner failed to establish that her claims to particular social groups are cognizable and that any past or future harm was or would be on account of her claims ground. The court should deny the first petition for review because the agency correctly ruled on cognizability and the record evidence does not compel the sole conclusion that the required nexus exists. As to the motion to reconsider, the board considered petitioner's arguments and found no error of law or fact in its prior decision. The court should deny the second petition for review because the board did not abuse its considerable discretion where petitioner's arguments either misstated the prior decision or lacked merit. As to the cognizability of the petitioner, it was her burden to establish that the group met the requirements, including immutability. By her own testimony, she undercut her theory on the lacking protection when she said I can't change this. The test is can't change or should not be required to change. And by her own testimony, she not only could, but evidence that it was likely that she was willing to do that. And so by her own testimony, she undercut her theory of the case. As to the required to change, I think we laid out in our brief that the immigration judge did consider both parts of the test and plan his decision. While a decision also is capable, always is capable of being clearer and more precise. The immigration judges here decision here lays out what he was deciding and why he was deciding it. And that is sufficient for review. And the board, I would argue on the social visibility issue, wasn't making fact finding. It's not saying this group is not socially distinct. What the board actually says is. We are unpersuaded by the argument that the immigration judge erred in finding that neither group was legally cognizable. They then cite to where she discussed both immutability that they had already adopted and affirmed, and where she also discussed social distinction. And all they're doing there is saying that her unsupported claims they're not making a fact finding that she didn't show or that this group isn't more precisely socially distinct. What they're saying there is you haven't presented it with what you've given us on appeal. So in effect, there's no reason to send this back to the immigration judge to do any fact finding. And so it's a fine distinction, but it is a distinction that is there. Before you move on, I wanted to ask you about immutability. I know you kind of passed by that already and talked about it, but women, Guatemalan women, that's immutable. And I understand who are business owners would not be immutable. That's something that's easily changed. But without male protection, that's a closer call in my view. And suppose that we didn't have the testimony, her testimony, saying, hey, this is going to change. My husband's likely to go back with me. I'm fine with this. Would it be immutable in the absence of that testimony? No, Your Honor. First of all, our position would be that she was required. She didn't argue or present any evidence before the immigration judge in any manner that she either couldn't change it or was not willing to change it. So first of all, it's her burden. So no, she would not have met the burden of showing that it is immutable. Second of all, what the agency does with these cases when they're doing a case-by-case determination is to look at the facts before them and the law that they have. And a couple of important points here are that in its decision in matter of MEDG, the board explains that the immutability standard that they're looking at is looking to whether the non-citizen would suffer significant harm if asked to give up the affiliation. And she hasn't shown that here. She didn't argue that. She didn't provide evidence of that. So under that test, it would not meet immutability. I'm going to press you a little bit on that. I'm going to change the facts just slightly. And I understand that this is not the case that I'm giving you. But suppose that she's LGBTQ and she has no interest in seeking male protection and therefore can't be required to seek male protection. Would that then be an immutable characteristic? Your Honor, I understand the question and I understand that this may not be the answer for which you're looking. But that would require an immigration judge determination on the facts presented as well as a board determination. Until we have a board determination evaluating that exact claim, we can't speak to it. What we can do, if you allow me, is to compare what they're looking at in those characteristics when they're looking at things that you cannot be required to change. There are cases where they found that before. They're looking for it to be comparable to the other bases in the refugee definition, race, religion, nationality, political opinion. So they have found, for instance, that Filipinos of mixed Chinese ancestry should not be, not only can they not, but they should not be required to change that. The women of a tribe in northern Toga, who not only have not been subjected to, but oppose the practice of female circumcision, should not be required to give up that opposition in order to avoid persecution. I get all that, but the reason why I'm asking is there's a difference between saying, and we have a Fourth Circuit and a Ninth Circuit case, and I'm a little hesitant to that one of them is not an immutable characteristic, women who don't have male protection, as a blanket matter, right, as a holding of this court, because that would be dangerous, would implicate a particular situation here, whereas I think you might be urging us to say, in this case, the petitioner has not established that she, that this is immutable characteristic for her. Am I reading you correctly on this? That is correct, your honor. We wouldn't, if that's what it comes to, would not ask the court to make a blanket rule, because, for instance, the immigration judges and the board are clear that these are case-by-case determinations and depend upon the specific facts and circumstances of each petitioner, each non-citizen who appears before them, and so a blanket rule would be improper, and so we're not asking for that. Does that answer the question? It does, thank you. You're welcome. On nexus, although petitioner puts forward that this is inextricably intertwined or tied up with a finding of whether or not certain harm was likely to occur, again, it was petitioner's burden when appearing before the court to present her case. First point on that is she relied upon the same groups, her same social groups, her claims groups, for both her past and her future harm. She didn't say that the future harm would be based on different group definitions. Second of all, she didn't say that different persons would be trying to harm her. She feared the persons who texted her and her notes and extorted money from her, so accepting that, which is what was done here by the immigration judge and then by the board, she didn't show that the motive for those individuals, either in the past or in the future, was or would be one of those grounds. The motive, the only motive she presented to the immigration judge was that they were looking to extort money from her. That was the only motive she presented. She said, I'm afraid to go back. I fear that they'll come after my son and I because we ignored their demands. And so she based it on the same claim as she presented for her past harm, and so it's the same motive. There's no need for the agency to have made a determination on what was likely to occur in the past or whether it was well-founded or clearly probable, given her presentation of evidence in this case. On the motion to reconsider, the immigration judge looked at her arguments, found them to, I'm sorry, I misspoke. The board looked at her arguments and found them to either misread its prior decision, for instance, in neither the immigration judge nor the board ever stated that her groups could never be a social group. What they said was, based on her presentation, they do not satisfy the standard. Matter of AB also does not require a remand that was cited for the rather unremarkable and mundane proposition that nexus is a factual determination, which is the analysis in which the immigration judge engaged, a factual determination. If there are no other questions from the court, I will conclude and rest on our boots. I see no other questions. So, Mr. Hoppe. Thanks again. I wanted to start out with immutability, which took up most of my colleague's time. The key thing to remember here is that the immutability standard addresses whether the members of the group can change the trait that unifies them, not whether somebody else can change it, but whether they can change it. The standard, as was announced in the early 80s, but pretty recently by this court in Constanza, is the group characteristic must be one that the members of the group either cannot change or should not be required to change. Here, the question was the very last question at trial. The trial attorney asked, and if you had to return to Guatemala, would you return with your husband? And she said yes. Our argument is twofold. One, as a factual matter, there isn't enough in this record to say conclusively that her husband would go with her. We already know that he's left before he went to the United States. But I don't want to miss the forest for the trees. I think the more central argument is that there's a second part to that legal standard that's listed in Constanza, not just whether it's actually possible that her that's the kind of thing we as a society should require. Here, the immigration judge said her husband could go with her or she could find a male to move in with. And as a legal matter, when we're just talking about social groups and past persecution, our argument is that the agency should not require people to find males to live with as a way to avoid persecution for reasons that, for example, the hypothetical about the LGBTQ petitioner. And so here, as it relates to the standard for immutability, we think the board just hasn't done its work yet. The analysis that the department is now offering in its brief and argument is missing from the board's decision because the board decided to adopt and affirm the immigration judge's decision and the immigration judge never addressed the second part of the immutability standard. Under the Chenery Doctrine, the right result is to remand. Even if the agency is going to disagree with this on remand, at a minimum, the agency should be the one to address this and to say whether this second half of the immutability standard, whether requiring a female asylum petitioner to find a male to live with, is really something that our asylum policy compels. That was her counsel who asked her that question, right? No, it was the DHS trial attorney. Okay, yes, I want to be sure. And what was the question about, had she asked her father-in-law for protection? You know what that question really is? Because that's the other thing I have noted and you apparently have it handy, but it's not handy, don't worry about it. Yeah, there's an exchange at page 36 of the trial testimony, which is 118th of the she said that when she was being attacked, her only thought was to call her father-in-law. But again... Well, did she? My notes act like, in the briefs, act like she did call the father-in-law. What does the testimony say? I'm not certain and it would take me digging through the records. Okay, not to worry, we can check it, Mr. Oppie. Go ahead, conclude. So, thank you for hearing our argument. I represent Anna and her child and they're seeking asylum in the United States in unprecedented times. They remain afraid to go back to the United States. We believe they've met the legal standard for asylum, which should be generous and especially the nexus determination, the cases say should be generous. We think the question about would you go back with your husband is sort of a gotcha throwaway question at the end of the trial, but does not address everything. And as far as the legal standard, the agency just missed it. We would ask the court to remit. Thank you both for your arguments. Cases number 20-3327 and 21-2173 are submitted.